1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ADRIAN LORENZANA,                          No.  2:18-cv-2535 WBS CKD P

12                        Petitioner,

13          v.                                    FINDINGS AND RECOMMENDATIONS

14    JOE A. LIZARRAGA,

15                        Respondent.

16

17          Petitioner is a California prisoner proceeding with counsel with a petition for writ of

18    habeas corpus under 28 U.S.C. § 2254.  On February 13, 2015, petitioner was convicted by a jury

19    in the Superior Court of Solano County of forcible rape, forcible oral copulation, two counts of

20    assault with a deadly weapon, battery with serious injury, criminal threats and 1st degree

21    burglary.  ECF No. 11-1 at 321-324.  On June 19, 2015, petitioner was sentenced to a total of 59

22    years and 8 months-to-life imprisonment.  Id.  On direct appeal, the California Court of Appeal

23    ordered that petitioner's aggregate sentence be reduced to 55 years-to-life.  ECF No. 11-9 at 15-

24    19.

25          Here, petitioner argues that his Constitutional rights were violated when the trial court

26    refused to excuse a juror who, according to petitioner, had committed prejudicial misconduct

27    during deliberations.  For the reasons which follow, the court will recommend that petitioner's

28    petition for a writ of habeas corpus be denied.

1

I. Background

On direct appeal, the California Court of Appeal summarized the evidence presented at trial as follows:

> Counts 1 through 6: S.V.
>
> On July 27, 2013, S.V. rented a room at the Solano Lodge in Fairfield. As she walked to her room a car driven by defendant pulled up beside her. Defendant had crossed eyes, long black hair, a goatee and was Mexican, and he asked her how much, if she was looking for a party, and for a date. He also said he had some coke. S.V. had been arrested for prostitution before and understood he wanted to pay for sex. S.V. was not working that night and said no.
>
> She went to her room. Soon, she heard a knock on her door. Thinking it was a friend she was expecting, she opened the door. Defendant barged in, pushing her. He had a knife out, pointing at her, and he said, "[L]et's do this." S.V. screamed because he scared her. He told her to take off her clothes and said he was going to kill her. She believed him. He said he wanted sex, and he repeated, "[I]f you don't do this, I will kill you." He said he wanted her to suck his penis. She complied; he still had the knife in his hand. Eventually he said, "[E]nough of this. Let's have sex." He was lying down, and she acted as if she was going to get on top of him, but instead she ran for the door. Defendant came behind her and grabbed her with his arms. They fell on the floor, wrestling, and she got stabbed in the thumb with the knife. She was bleeding a lot and just gave up. This time when he told her to take her clothes off she complied, after wrapping her hand in a towel. She pleaded with him to use a condom and he did. Defendant lay on top of her and inserted his penis inside her vagina. He also sucked her left breast. At this point, she was no longer resisting; he still had the knife in his hand. When defendant finished, he told S.V. to get dressed; he flushed the condom in the toilet. After she got dressed, defendant went through her purse. He found her I.D. and wrote all her identification information on a package of soap. He told her if she called the police it was going to be "all bad." Because he had her information, she was very scared he would be outside her house waiting for her. Defendant told her he was going to take her to the hospital and they left the room at the same time. S.V. acted as if she was going to walk with him but then walked fast towards the motel office. Defendant told her she better not call the police. She could not recall what he said would happen if she called the police, but she did remember "him saying he was going to kill me a couple of times through the whole thing."
>
> S.V. took a taxi to the hospital, where she was treated for her thumb injury, a DNA sample was taken from her breast, and she gave a statement to police. Later, she spoke to Detective Pucci. After speaking to Detective Pucci, S.V. told her friend, D.S., about the attack and described her attacker as having a "lazy eye."
>
> Months later, S.V. saw defendant in a different car stopped at a stop light. They locked eyes, and when the light turned green, he took

off.  S.V. told Detective Pucci about the sighting.  The same day she saw defendant at the stoplight, S.V.'s friend, D.S., told her she, too, had been attacked.  Her description of the attacker made S.V. think of defendant, and she told D.S. she should go to the police.

Eventually, S.V. had to have two surgeries to her thumb.  As of the time of trial, she had no feeling in the tip of her thumb and she could not bend it.  The DNA from her breast matched defendant's DNA.

Counts 7-11: D.S.

On October 19, 2013, D.S. rented a room at the Solano Lodge in Fairfield.  As she was walking to the liquor store next door, she was approached by a man driving a silver SUV-like car, who propositioned her.  The man was a short-haired Latino with a crossed eye.  She identified defendant in court as that man.  She got in the car with him.  She agreed to have sex with him for $50.  They drove to the Lodge and entered her room together.  When he closed the door, defendant pulled out a little pocket knife and said, "[Y]ou're going to do this for free."  At that moment she realized defendant was the same person who had attacked S.V., and she screamed.  Defendant told her to shut up and be quiet; they tumbled into the closet.  D.S. grabbed the knife and cut herself, but the cut "wasn't bad."  "It was probably a little deeper than a paper cut."  D.S. continued screaming and fighting him.  At that point, defendant started saying he was going to kill her.  She told him "'no you're not because you would have done it already' because he had the knife.  It was like he was purposely like not trying to hit me with the knife."  D.S. tried to escape, but defendant threw her onto the bed and started to choke her.  D.S. blacked out from the choking, and when she regained consciousness defendant was on top of her trying to get her pants off.

First, he wanted her to perform oral sex on him without a condom, but she persuaded him to get one; she put it on his penis.  She then sucked his penis for a few seconds.  She remembered stopping and lying back, whereupon defendant got on top of her and had vaginal sex with her.  D.S. was scared of defendant; she "could have not woken up after he choked me out."  She did not want to have oral or vaginal sex with him because "[h]e was . . . asking me to perform a service that I was charging for and he didn't pay me."

After the sex act, he left the room quickly.  As he was leaving, D.S. said something to him about cutting his hair because she wanted him to know she knew who he was.  The following week, she went to the police.

Defendant was interviewed by Detective Pucci.  When confronted with the DNA evidence, defendant maintained a former girlfriend from high school, K.G., planted the DNA on S.V.  He stated he cut his hair on October 18, 2013.

Defendant's jail cell roommate testified that defendant offered to pay him to have his girlfriend pose as defendant's girlfriend, K.G., and deliver a letter to S.V.'s apartment in order to convince her to accept payment for not testifying against him.  The script for what the

3

> proposed letter should say was confiscated by jail staff, identified at trial by the informant, and admitted as evidence. The letter is addressed to S.V., at her apartment number. In the script, "K." offers to pay S.V. to not testify against defendant. A postscript adds, "[I]f she says yes tell her you need a #number and you need a few days to get the money together and no funny shit!"

ECF No. 11-9 at 4-6.

With respect to his convictions, petitioner presented the same claim before the California Court of Appeal that he raises here. The Court of Appeal rejected the claim and affirmed petitioner's convictions. Id. at 6-14. Petitioner sought review in the California Supreme Court, and the petition for review was denied. ECF No. 11-10.

II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

/////

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). The California Court of Appeal's decision on direct appeal is the last reasoned state court decision with respect to petitioner's claims.

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III.  Petitioner's Claim and Analysis

Petitioner claims that he was denied his Sixth Amendment right to jury trial and his Fourteenth Amendment right to due process when the trial court refused to excuse juror No. 9 for attempting to speak with Detective Pucci after the case had been sent to the jury for deliberations. The California Court of appeal summarized the facts concerning petitioner's claim as follows:

/////

5

The jury began deliberations on February 10, 2015.  At the end of the day on Wednesday, February 11, the jury advised the court it had reached unanimous verdicts on counts 1, 2, 3, 4, and 6, but were unsure about counts 5, 7, 8, 9, 10, and 11.  The jury also indicated confusion about the multiple victim allegation attached to counts 1 and 2, which the court clarified.  The foreperson informed the court that after several ballots, the vote on the undecided counts stood at 11 to 1.  Each juror was polled and indicated further deliberations on those counts would be fruitless.  The court decided to recess deliberations until Friday, February 13, 2015, at 9:30 a.m. for the jury to complete its work on the special allegations attached to its verdicts.  The verdicts were locked in an office until the jury's return.

On February 13, 2015, before the jury began deliberating, the court was informed that after retiring on Wednesday evening, Juror No. 9 approached Detective Pucci and asked if he could ask the detective something.  When Detective Pucci indicated that would not be appropriate, the juror replied, "This is just not right" and walked away.

The court questioned Juror No. 9 about the encounter in the courtroom.  The juror explained he had "never been through anything like this before" and "it's actually pretty emotional."  Juror No. 9 just "wanted . . . to relay a message to [the court]" and "didn't . . . think I had a way to."  He wanted to ask the Court "[t]o review the one juror that is having problems with that."  In response to a question by defense counsel, Juror No. 9 said, "The one juror had explained to us she was on a previous trial and that she was the only person that held out and that she didn't follow the case. After it was a hung jury [she] followed the case to its completion and [was] satisfied with that end result. . . .  And she also explained how her son is cross-eyed like your defendant and explained how it was more common than you would think. And I felt . . . the outcome would be different if she wasn't a juror."  Defense counsel requested Juror No. 9's removal for misconduct, pointing out that the court had clearly admonished the jurors not to communicate with anyone, especially witnesses, about the case, and that Juror No. 9 must have known he could send a message to the court through the bailiff.  The court denied the request, noting that "attempting to get the Court's attention through the detective was not appropriate," but the court did not "think there is any prejudice."

Shortly thereafter, the court recalled the jury to the courtroom. The foreperson indicated the jury had actually completed its verdicts on the counts and findings on which it had previously come to a decision.  The court asked that the completed verdict forms be brought to the courtroom.  Upon review, the court determined the multiple victim allegation form had yet to be signed and it returned all the verdict forms to the foreperson. The court then reinstructed the jury on its duty to deliberate.  Among other things, the court asked the jury "to carefully consider, weigh, and evaluate all of the evidence presented at the trial and to discuss your views regarding the evidence and to listen and consider the views of your fellow jurors.  [¶] In the course of further deliberations, you should not hesitate to re-examine your own views or to request your fellow

6

jurors to re-examine theirs. . . .  [¶] . . . It is your duty . . . to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your own individual judgment.  [¶] Both the People and the defendant are entitled to the individual judgment of each juror."  In conclusion, the court asked the jury to "complete the . . . special findings on the verdicts that you have completed and to at least discuss the possibility of deliberating further, if you can do so."

The jury retired to deliberate at 9:30 a.m.  At 11:45 a.m. it returned guilty verdicts on counts 1, 2, 3, 4, 5, 6, and 9.  The jury found true all the special allegations except the multiple victim allegations (§ 667.61, subd. (e)(4)) attached to counts 1 and 2. The court declared a mistrial on counts 7, 8, 10, and 11.

ECF No. at 7-9.  The California Court of Appeal addressed petitioner's juror misconduct claim as follows:

"The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution." (*Lombardi v. California St. Ry. Co.* (1899) 124 Cal. 311, 317; accord, *People v. Nesler* (1997) 16 Cal.4th 561, 578; Cal. Const., art. 1, § 16; U.S. Const., 6th & 14th Amends.)  "An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' "  (*In re Hamilton* (1999) 20 Cal.4th 273, 293–294; *see People v. Harris* (2008) 43 Cal.4th 1269, 1303 (*Harris*).)  "When even one juror lacks impartiality, the defendant has not received a fair trial." (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1111.)

The trial court may discharge a juror who commits misconduct. (§ 1089.) . . .

"We first determine whether there was any juror misconduct.  Only if we answer that question affirmatively do we consider whether the conduct was prejudicial." (*People v. Collins* (2010) 49 Cal.4th 175, 242.)  "To succeed on a claim of juror misconduct, 'defendant must show misconduct on the part of a juror; if he does, prejudice is presumed; the state must then rebut the presumption or lose the verdict.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1178.)  "[I]n determining whether misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*People v. Majors* (1998) 18 Cal.4th 385, 424–425.)

Here, the incident which brought Juror No. 9 to the court's attention was his attempt to speak with Detective Pucci.  There is no doubt it would have been misconduct for Juror No. 9 to discuss the case with a nonjuror (in this case, a witness) during the course of trial. (*People v. Linton* (2013) 56 Cal.4th 1146, 1194 (Linton).)  "A juror's unauthorized contact with a witness is improper." (*Cowan*, supra, 50

Cal.4th at p. 507; *see* § 1122, subd. (a)(1) [jurors should not converse with anyone on any subject connected to the trial].)

It is also misconduct to disregard the court's instructions. (*Linton*, supra, 56 Cal.4th at p. 1194.)   In this case the jury had been specifically instructed more than once not to talk "about the case or about any of the people or any subject involved in the case with anyone," including witnesses. (*Ibid*.; *People v. Loker* (2008) 44 Cal.4th 691, 754; *People v. Pierce* (1979) 24 Cal.3d 199, 207; *People v. Stewart* (2004) 33 Cal.4th 425, 509–510.)  The court's admonition was broad enough to cover a discussion of Juror No. 9's frustrations with jury deliberations.

However, Juror No. 9 did not actually speak with Detective Pucci about the case or about his frustrations with the deliberative process in general and the holdout juror in particular. Detective Pucci correctly rebuffed Juror No. 9, who did not pursue the conversation but walked away muttering, "This is just not right."  If, instead of approaching Detective Pucci, Juror No. 9 had approached the bailiff about getting a message to the judge, there would be no issue of juror misconduct.

This raises the question whether Juror No. 9's contact with Detective Pucci was "de minimus under the circumstances of this case," such that the presumption of prejudice was rebutted (*People v. Hardy* (1992) 2 Cal.4th 86, 174 (*Hardy*); *see Cowan*, supra, 50 Cal.4th at p. 507), or the presumption of prejudice was not raised at all. (*People v. Woods* (1950) 35 Cal.2d 504, 512 (*Woods*).)  Defendant argues the presumption of prejudice was not rebutted because Juror No. 9's reasons for seeking out Detective Pucci—to relay a message to the court about dysfunction in the jury room—shows he was actually biased against the defense.  We disagree.  Juror No. 9's attempt to contact the detective came after two days of deliberations.  It cannot be misconduct for a juror to form opinions about a defendant's guilt or innocence, based on the evidence, during deliberations.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1352.)  That is the point of jury deliberations.  Here, there was no intimation that Juror No. 9 was influenced in any way by Detective Pucci's fleeting comment that it would be inappropriate for him to speak with Juror No. 9.

Defendant also faults the court for the procedural error of not requiring the prosecution to rebut the presumption of prejudice. (*See People v. Weatherton* (2014) 59 Cal.4th 589, 600 (*Weatherton*).)  In *Weatherton*, the trial court found the juror had committed serious misconduct by lobbying the other jurors to vote guilty before deliberations had even started.    (*Ibid*.) The court nevertheless concluded, without input from the prosecutor, there was no substantial likelihood of bias.  (*Ibid*.)  The Supreme Court observed: "This formulation has it backward.  Once a court determines a juror has engaged in misconduct, a defendant is presumed to have suffered prejudice.    [Citation.]    It is for the prosecutor to rebut the presumption by establishing there is 'no substantial likelihood that one or more jurors were actually biased against the defendant.' " (*Ibid*.)  Applying independent review, the Supreme Court concluded that given the nature, scope, and frequency of the misconduct, the

People had not discharged its burden of showing the juror was unbiased. The court set aside the verdict " 'because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard.' " (*Ibid*.)

In our view, the court below did not commit *Weatherton* error.  We view the court's comments as indicating it found Juror No. 9's inappropriate conduct a de minimus transgression under the circumstances, within the meaning of *Cowan*, supra, 50 Cal.4th at page 507, *Woods*, supra, 35 Cal.2d at page 512, and *Hardy*, supra, 2 Cal.4th at page 174.   We cannot say the court abused its discretion in coming to that conclusion on this record.  Juror No. 9's act of approaching Detective Pucci to ask a question is nothing like the juror's sustained lobbying efforts in favor of a guilty verdict in *Weatherton*.  Nothing in this record suggests Juror No. 9 formed or expressed any opinion about defendant's guilt or innocence before deliberations began, or lobbied other jurors, or in any way was "transform[ed] from impartial fact finder to combative advocate before deliberations began." (*Weatherton*, supra, 59 Cal.4th at p. 600.)  At most, Juror No. 9's comments indicated his surprise at the emotional nature of the deliberative process and his frustration with the holdout juror's arguments based on factors other than the evidence adduced at trial.  This did not make Juror No. 9 a biased adjudicator.

We believe the remark by Juror No. 9 to Detective Pucci in this case suggests only a degree of frustration by that juror over a position possibly held by another juror.  Nothing in this record indicates Juror No. 9 reached his view on defendant's guilt other than by a proper assessment of the evidence and that evidence alone.  His view on the analysis of the same evidence articulated by another juror in the deliberations is an understandable view after two days of deliberation.  We realize at the time of the challenged conversation, the jury had unanimously decided five counts, including serious crimes like rape and forcible oral copulation, and were possibly hung 11 to 1 on the remaining charges.

As the Supreme Court has observed in assessing prejudice and juror misconduct, "the presumption of prejudice is rebutted, and the verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant.   [Citations.] Our inquiry in this regard is a 'mixed question of law and fact' subject to an independent appellate review. [Citation.] But ' "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by the evidence." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 95–96.)

In a case such as this, "[t]he presumption of prejudice may be rebutted, *inter alia*, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm." (*Hardy*, supra, 2 Cal.4th at p. 174; accord, *People v. Loot* (1998) 63 Cal.App.4th 694,

697.) " '[W]hether an individual verdict must be overturned for jury misconduct or irregularity " ' "is resolved by reference to the substantial likelihood test, an objective standard." ' " [Citation.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant. [Citations.]' [Citation.] We independently determine whether there was such a reasonable probability of prejudice." (*Harris*, supra, 43 Cal.4th at pp. 1303–1304.)

Upon our independent review of the record, we are persuaded that the presumption of prejudice was rebutted in the present case. First, the misconduct was not serious in nature. So far as this record shows, after Juror No. 9 made unsuccessful contact with Detective Pucci, he left and did not return until Friday, when he was questioned before deliberations began again. There was no opportunity for the misconduct in contacting Detective Pucci to somehow infect the deliberations with prejudicial matter that was not part of the trial record on which the case was submitted to the jury. There is no basis to infer that Detective Pucci's few words rebuffing Juror No. 9's approach created anything in Juror No. 9's mind other than awareness he had crossed a line.

Furthermore, Juror No. 9's attempt to contact the detective could not have affected the verdicts. The jury had already decided the verdicts on counts 1, 2, 3, 4, and 6 before the attempted contact; these verdicts were signed on February 10 or 11. The jury had the day off on February 12. When the jurors returned to deliberate on February 13, after the attempted contact, they were unable to agree on all but two of the remaining substantive counts. The guilty verdicts on count 9 (assault with a deadly weapon on D.S.) and count 5 (criminal threats against S.V.) were signed on February 13, as were the true finding on the knife use allegations made in connection with counts 5 and 6 and the not true findings on the two multiple victim allegations made in connection with counts 1 and 2. Before resuming deliberations on February 13, the jury was reinstructed on how it should approach deliberations with an open mind. We presume the jurors followed the instructions as given, and have every reason based on the record to determine that they did so. (*People v. Cain* (1995) 10 Cal.4th 1, 34.) We find no substantial likelihood that one or more jurors were actually biased against defendant. The trial court therefore did not abuse its discretion by keeping Juror No. 9 on the jury.

The court agrees with the Court of Appeal that Juror No. 9's communication with Detective Pucci, in the literal sense, amounts to misconduct. But, the comments themselves do not suggest a violation of any Constitutional right such as the right to a fair trial before impartial jurors. See Irwin v. Dowd, 366 U.S. 717, (1961). The Supreme Court has found that outside contact with a juror can, in certain circumstances, be presumptively prejudicial. See Remmer v.

10

1    U.S., 347 U.S. 227, 229 (1954).   Even if the court found that petitioner's interaction with

2    Detective Pucci was presumptively prejudicial, however, the trial court's inquiry into the

3    interaction served to rebut any suggestion that there was prejudice.

4         Furthermore, the California Court of Appeal's rejection of petitioner's juror misconduct is

5    not contrary to Supreme Court precedent, it does not involve an unreasonable application of

6    Supreme Court precedent and it is not based upon an unreasonable determination of the facts.

7    Accordingly, habeas relief is precluded under 28 U.S.C. § 2254(d).

8         Petitioner argues that the Court of Appeal did not conform to California law in reaching a

9    decision as to petitioner's claim.   However, that does not matter here as a petition for a writ of

10   habeas corpus can only be granted for violations of Federal law such as the right to a fair trial

11   before impartial jurors.   There is no showing that any of petitioner's federal rights were violated.

12   IV.   Conclusion

13        For all of the foregoing reasons, the court will recommend that petitioner's petition for a

14   writ of habeas corpus be denied, and this case be closed.

15        In accordance with the above, IT IS HEREBY RECOMMENDED that:

16        1.  Petitioner's petition for a writ of habeas corpus (ECF No. 1) be denied; and

17        2.  This case be closed.

18        These findings and recommendations are submitted to the United States District Judge

19   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).   Within fourteen days

20   after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties.   Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations."   In his objections petitioner

23   may address whether a certificate of appealability should issue in the event he files an appeal of

24   the judgment in this case.   See Rule 11, Federal Rules Governing Section 2254 Cases (the district

25   court must issue or deny a certificate of appealability when it enters a final order adverse to the

26   applicant).   Any response to the objections shall be served and filed within fourteen days after

27   /////

28   /////

1

2  service of the objections.  The parties are advised that failure to file objections within the

3  specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

4  F.2d 1153 (9th Cir. 1991).

5  Dated:  March 22, 2021

6  _____

7  CAROLYN K. DELANEY
   UNITED STATES MAGISTRATE JUDGE

8

9

10  1
    lore2535.157

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28